IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


RONALD RUSH,

        **Plaintiff,**


    **vs.**                                **Civil Action 2:11-CV-127**
                                          **Magistrate Judge King**


**E.I.DuPONT DeNEMOURS
AND COMPANY,**

        **Defendant.**


<u>**OPINION AND ORDER**</u>

      This is an employment action in which plaintiff alleges that defendant violated plaintiff's rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by using FMLA-protected leave as a factor in disciplining plaintiff and ultimately terminating his employment and by retaliating against plaintiff for his exercise of his rights under the FMLA. Plaintiff also asserts supplemental state law claims of retaliation in violation of O.R.C. Chapter 4112 and violation of public policy. Plaintiff further asserts a claim of race discrimination in contravention of O.R.C. §§ 4112.02, .99 and a claim of intentional infliction of emotional distress. With the consent of the parties, 28 U.S.C. § 636©, this matter is now before the Court on *Defendant's Motion for Summary Judgment*, Doc. No. 17 ("*Motion for Summary Judgment*"). For the reasons that follow, the *Motion for Summary Judgment* is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. Plaintiff's Employment History with Defendant

On November 3, 2003, DuPont hired plaintiff, an African-American male, as an operator earning $10.61 an hour at its Hilliard, Ohio location. *Deposition of Ronald Rush*, Doc. No. 18 ("*Plaintiff Depo.*"), pp. 10, 23; *Exhibit 7*, attached thereto; *Exhibit 1*, DRR0000317[1], attached to *Affidavit of Karen Canterbury* ("*Canterbury Affidavit*"), attached to *Motion for Summary Judgment*;[2] *Affidavit of Ronald Rush*, ¶ 2 ("*Plaintiff Affidavit*"), attached to *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, Doc. No. 22 ("*Memo. in Opp.*").

In early February 2004, DuPont promoted plaintiff to the position of production support technician with a pay increase to $12.74 per hour. *Plaintiff Depo.*, pp. 28-29; *Exhibit 7*, attached thereto. DuPont again promoted plaintiff in April 2006 to the position of senior production support technician, increasing his pay rate to $18.13 per hour. *Plaintiff Depo.*, pp. 29, 33.

In August 2006 and again in 2007,[3] plaintiff applied for the position of senior lab technician in DuPont's Houston, Texas office.

---

[1]For ease of reference, the Court will cite to the bates numbers when referring to specific page numbers of the exhibits, many of which are voluminous.

[2]Ms. Canterbury is the current Human Resources & Safety Heath and Environment Supervisor for DuPont at the Hilliard, Ohio facility. *Id*. at ¶ 2. She has known plaintiff during his employment with, and separation from, DuPont. *Id*. at ¶ 3.

[3]The record is unclear as to whether plaintiff applied for this position in January 2007 or September 2007. *See Canterbury Affidavit*, ¶ 6 (listing a September 2007 application date); *Exhibit 1*, DRR0000318, attached thereto (listing a January 2007 application date).

*Plaintiff Depo.*, pp. 81, 83; *Canterbury Affidavit*, ¶ 6.  DuPont did not award this position to plaintiff on either occasion, but instead hired a non-DuPont Hispanic applicant in 2006 and hired an African-American applicant in 2007, both of whom already lived in Houston, Texas.  *Canterbury Affidavit*, ¶ 6.

In 2007, DuPont opened, on a trial basis, the position of Operations specialist / MiniMix for the first, second and third shifts.  Plaintiff did not initially volunteer, but later applied for the positions when they were officially posted in June 2007. *Canterbury Affidavit*, ¶ 7.   The "third shift position was posted in error because the individual who volunteered for the position (a Caucasian male) was currently still in the role and was successful in that position."  *Id*.  For the first shift position, DuPont hired a Caucasian male with experience as a Senior Master Operator in production and in quality control who "was a highly qualified Master Operator who had been with the company since May 1994."  *Id*. at ¶ 8. For the second shift position, DuPont hired a Caucasian male who had been with DuPont since November 2003 and who had out-performed plaintiff during the interview process.  *Id*. at ¶ 9.

Plaintiff applied for another position, FasTrac Sales Coordinator, in June 2007.  *Id*. at ¶ 10.  DuPont hired a Caucasian female "who had superior experience in her previous role as Production Shift Leader" and who had superior communication skills for customer service duties.  *Id*.; *Plaintiff Depo.*, p. 90.

In July 2007, plaintiff applied for yet another position, shift leader / production supervisor.  *Canterbury Affidavit*, ¶ 11.  DuPont filled that position with a Caucasian male "with extensive supervisory

and lean manufacturing experience[.]" *Id.*

Plaintiff complained about these decisions and sought legal counsel. *Plaintiff Depo.*, p. 203; *Canterbury Affidavit*, ¶ 13. On August 29, 2007, DuPont responded to a letter written by plaintiff, explaining why DuPont selected other applicants for these positions. *Canterbury Affidavit*, ¶ 13; *Exhibit 1*, attached thereto.

In September 2007, DuPont promoted plaintiff to production support group leader at an hourly pay rate of $19.98. *Plaintiff Depo.*, pp. 37-39; *Exhibit 9*, attached thereto. In this capacity, plaintiff reported directly to Greg Jacobs, current Production Support Supervisor at the Hilliard, Ohio facility. *Plaintiff Depo.*, pp. 38-39; *Affidavit of Gregory Jacobs* ("*Jacobs Affidavit*"), ¶¶ 2-3, attached to *Motion for Summary Judgment*.

In February 2009, plaintiff requested a step down from his third shift group leader position because of the stress of dealing with a fellow employee and because of foot issues. *Plaintiff Depo.*, pp. 64-66, Exhibit 10, attached thereto. DuPont granted plaintiff's request and transferred him to second shift as a senior production technician. *Id.* Although this transfer decreased plaintiff's hourly rate from $20.68 to $19.70, plaintiff was confident that he could make up the difference with overtime. *Plaintiff Depo.*, p. 64.

**B.   DuPont's Attendance Policy**

DuPont's employee handbook ("the Handbook") contains policies on attendance and punctuality ("the Attendance Policy"). *Plaintiff Depo.*, pp. 25-26; *Exhibits 3* and *5*, attached thereto. The Attendance Policy, applicable to regular full-time employees, explains the importance of reliable attendance and warns that poor attendance and

4

tardiness may result in graduated disciplinary action:

> To maintain a safe and productive work
> environment, DuPont Powder Coatings expects
> employees to be reliable and to be punctual in
> reporting for scheduled work.  Absenteeism and
> tardiness places a burden on other employees and
> on the company. . . . Poor attendance and
> excessive tardiness are disruptive to business,
> and may lead to disciplinary action, up to and
> including termination of employment.

*Exhibit 5*, at DRR0000077, attached to *Plaintiff Depo*.  Specifically,

the Attendance Policy provides for certain disciplinary action taken

following attendance occurrences:

> One (1) occurrence:  Discuss [] attendance policy
> Two (2) occurrences:  Note to File Status
> Three (3) occurrences:  Verbal Contact
> Four (4) occurrences: Written Contact
> Five (5) occurrences: Written Contact with Probation
> Six (6) occurrences: Suspension/Termination

*Id*. at DRR0000079. A planned or approved absence, including FMLA

leave, is not counted as a chargeable occurrence.  *Id*. at DRR0000078.

**C.   Plaintiff's Attendance Occurrences and Progressive
      Discipline**

Beginning in June 2009, plaintiff experienced attendance

problems:

> This is a note to file to verify that communication has
> taken place between Ron Rush and his Supervisor Greg Jacobs
> about his attendance.  Ron has exceeded his attendance limit
> by one and a half days.  Occurrence (1) - 7/17/09,[4]
> occurrence (2) 09/24/09.  The next unexcused absence will be
> a verbal warning.

*Exhibit 21*, attached to *Plaintiff Depo*.  *See also Plaintiff Depo*., p.

116.  Plaintiff was issued a verbal warning in October 2009 for

his third occurrence under the Attendance Policy.  *Plaintiff Depo*.,

---

[4]It is not clear why Mr. Jacobs refers to this date rather than June 12,
2009.  *See Exhibit 16*, attached to *Plaintiff Depo*.

pp. 114-15; *Exhibit 16*, attached thereto.

Plaintiff was absent on December 2, 2009 through December 4, 2009, which was considered his fourth occurrence under the Attendance Policy, and he received a written warning. *Plaintiff Depo.*, pp. 119-20; *Exhibit 17*, attached thereto. Plaintiff was advised that "[f]urther violations will result in further disciplinary action up to and including termination of employment." *Exhibit 17*, attached to *Plaintiff Depo.* Plaintiff missed two more days of work in February 2010. *Exhibit 19*, at DRR0000353, attached to *Plaintiff Depo*. Because of these occurrences, plaintiff was suspended without pay for three (3) days and was placed on probation for a period of one (1) year. *Id.* Plaintiff was also required to develop

> an action plan to improve his performance that is agreed upon by his supervisor by 2/19/2010. Any further policy violations or performance issue will result in further disciplinary action. The first consideration will be termination of employment.

*Id.* Plaintiff and his supervisor, Mr. Jacobs, finalized plaintiff's "Formal Development Plan for Performance Improvement" ("the Plan"), *id.* at DRR0000354, in which plaintiff acknowledged that he has "no PTO [paid time off] call ins available for the rest of the year 2010." *Id.*

### D. Plaintiff Requests and Receives Intermittent FMLA Leave

The Handbook also addresses absences in connection with FMLA leave:

> A health care provider's statement must be submitted verifying the need for FMLA and its beginning and expected ending dates within 15 days. . . . Employees returning from FMLA must submit a health care provider's verification of their fitness to return to work.

*Exhibit 5*, at DRR0000064-DRR0000065, attached to *Plaintiff Depo.*

In May 2010, plaintiff requested and received intermittent FMLA leave for depression, anxiety and other mental health issues. *Id.* at 148-152; *Plaintiff Affidavit*, ¶ 4; *Exhibit 1*, attached thereto; *Canterbury Affidavit*, ¶ 16. Plaintiff took approximately three weeks off in May and June 2010. *Plaintiff Depo.*, p. 151; *Plaintiff Affidavit*, ¶¶ 10-11. Plaintiff's doctor authorized plaintiff's leave from late June 2010 to July 2010 because plaintiff had experienced adverse reactions to medication. *Plaintiff Depo.*, pp. 151-52.

Plaintiff understood that, in order to take intermittent FMLA leave, he was responsible for calling and advising a nurse at DuPont's Circleville, Ohio location and plaintiff's supervisor in Hilliard, Ohio. *Id.* at 149-51; *Plaintiff Affidavit*, ¶¶ 9-10. Plaintiff also understood, and complied with, the requirement that he submit a doctor's note each time he returned from intermittent FMLA leave. *Plaintiff Affidavit*, ¶¶ 9-11.

Certain paperwork also accompanied plaintiff's request for intermittent FMLA leave. For example, plaintiff completed and returned a form dated May 14, 2010, requesting FMLA leave for mental health reasons beginning May 14, 2010 with an expected return date of June 1, 2010. *Plaintiff Affidavit*, ¶ 4; *Exhibit 1*, attached thereto. Plaintiff also submitted a medical certification by Janet Clark, Ph.D., his treating psychologist, *Plaintiff Affidavit*, ¶¶ 5-7; *Exhibits 2* and *3*, attached thereto, *who* diagnosed depression and who stated that "[i]ntermittent time off work may be necessary if depressive symptoms interfere with [plaintiff's] ability to go to work – no more than 4 days/month." *Exhibit 3*, at DRR0000568, attached to

*Plaintiff Affidavit*.  Dr. Clark also noted that plaintiff would need weekly psychotherapy for six months to one year.  *Id.*

Plaintiff did not comply with Ms. Canterbury's request for a release to allow Circleville Medical Department to contact his doctor regarding intermittent leaves of absences.  *Canterbury Affidavit*, ¶ 16; *Plaintiff Depo.*, pp. 148-50; *Exhibit 18*, attached thereto. According to plaintiff, his doctor refused to complete this form. *Plaintiff Depo.*, pp. 148-49.

Plaintiff agrees that DuPont granted him intermittent FMLA leave throughout the summer of 2010 and did not charge any of that leave as an attendance occurrence.  *Plaintiff Depo.*, p. 152; *Plaintiff Affidavit*, ¶¶ 8, 10-11.

### E.    Events of September 2010

On September 8, 2010, plaintiff asked Mr. Jacobs for permission to miss work on Wednesday, September 22, 2010, so that plaintiff could attend the "Juggette" or "The Jug" horse races in Delaware, Ohio.[5] *Plaintiff Depo.*, pp. 152-54; *Jacobs Affidavit*, ¶ 11; *Exhibit 6*, attached thereto.  Because plaintiff had accrued only four hours of vacation leave, *Canterbury Aff.* ¶ 19, Mr. Jacobs offered one-half day or a split shift.  *Plaintiff Depo.*, pp. 153-54; *Jacobs Affidavit,* ¶ 11; *Exhibit 6*, attached thereto.  Plaintiff rejected both options, explaining that the event involved family and "drinking."  *Plaintiff Depo.*, pp. 153-54.

About a week later, plaintiff asked to take a personal day on

_____

[5]The "Jug" races, which last an entire week, include "the Juggette," which is the preview race for the Kentucky Derby, and "the Little Brown Jug," which is "a big purse race" scheduled on Thursday, September 23, 2010. *Plaintiff Depo.*, pp. 157-58; *Jacobs Affidavit*, ¶ 14.

September 22, 2010. *Id*. at 154; *Jacobs Affidavit*, ¶ 12; *Exhibit 7*, attached thereto. He followed up with a request of Mr. Jacobs and Ms. Canterbury take the day off as an unpaid personal leave of absence. *Plaintiff Depo*., p. 154. Ms. Canterbury denied that request, explaining that unpaid personal leave is reserved for an event that is (1) unplanned, (2) an emergency, and (3) requires the presence of the employee. *Canterbury Affidavit*, ¶ 18; *Exhibit 2*, attached thereto. *See also Jacobs Affidavit*, ¶ 13; *Exhibit 8*, attached thereto; *Plaintiff Depo*., pp. 154, 211-12; *Exhibit 5*, at DRR000066, attached thereto

On Thursday, September 23, 2010, *i.e.,* the day after the day for which plaintiff had requested leave, plaintiff called Mr. Jacobs and DuPont Circleville Medical, requesting intermittent FMLA for that day and the next. *Plaintiff Depo*., pp. 158-59; *Plaintiff Affidavit*, ¶¶ 12-13; *Jacobs Affidavit*, ¶ 13; *Exhibit 8*, attached thereto. Plaintiff testified that he had awakened that morning "feeling very depressed and could barely force" himself out of bed and was upset and "P'd off" about DuPont's "attendance policies and everything else." *Plaintiff Affidavit*, ¶ 12; *Plaintiff Depo*., pp. 157-59.

Michelle Grooms, a nurse at Circleville Medical who administered DuPont's Family Medical Leaves, called Ms. Canterbury about plaintiff's request. *Canterbury Affidavit*, ¶ 20. Ms. Canterbury then spoke with Mr. Jacobs, *id*. at ¶ 21; *Jacobs Affidavit*, ¶ 14, who had learned that "the Jug" horse races spanned the entire week. He and Ms. Canterbury suspected that plaintiff was invoking FMLA leave in order to take time off for the races. *Id*. Ms. Canterbury instructed Nurse Grooms to prepare a release that would permit DuPont to

investigate plaintiff's FMLA usage. *Canterbury Affidavit*, ¶ 22.

Plaintiff's regular scheduled shift that day was 3:00 p.m. to 11:30 p.m. *Plaintiff Depo.*, p. 157. At about 5:00 p.m., plaintiff went to a friend's house to watch his friend's two children. *Plaintiff Depo.*, pp. 157, 159-60. Plaintiff took one of the children home with him that night to babysit. *Id*. at 160-61. Around noon the next day, plaintiff attended a psychotherapy session with Dr. Clark, taking the toddler with him. *Id*. at 161; *Plaintiff Affidavit*, ¶ 13. Plaintiff thereafter met his friend and then went home. *Plaintiff Depo.*, p. 161. Plaintiff denies that he attended the horse races on either date.

On Monday, September 27, 2010, plaintiff returned to work and submitted a note from Dr. Clark, which apparently[6] provided that plaintiff "should be off work for 23rd and 24th of September[.]" *Plaintiff Affidavit*, ¶¶ 13-14; *Plaintiff Depo.*, pp. 161-62. Mr. Jacobs accompanied plaintiff to Ms. Canterbury's office. *Plaintiff Affidavit*, ¶ 14; *Plaintiff Depo.*, pp. 161-62; *Canterbury Affidavit*, ¶ 23; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. Ms. Canterbury's informed plaintiff that DuPont was investigating his use of FMLA leave for September 23 and 24, 2010. *Plaintiff Affidavit*, ¶ 14; *Plaintiff Depo.*, p. 163; *Canterbury Affidavit*, ¶ 23; *Jacobs Affidavit*, ¶ 25; *Exhibit 9*, attached thereto. Plaintiff was also notified that he could not be on DuPont premises during this process. *Plaintiff Affidavit*, ¶¶ 14-15; *Plaintiff Depo.*, p. 163; *Canterbury*

---

[6]Because neither party has provided a copy of Dr. Clark's note, the Court relies on plaintiff's response to defense counsel's characterization of Dr. Clark's note. *See Plaintiff Depo.*, p. 162.

*Affidavit*, ¶ 23; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. According to plaintiff, he was asked to leave three times. *Plaintiff Depo.*, pp. 164-65, 167.

Plaintiff became angry. *Plaintiff Affidavit*, ¶ 16; *Plaintiff Depo.*, pp. 163-64; *Canterbury Affidavit*, ¶¶ 23-24; *Exhibit 3*, attached thereto; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. He left Ms. Canterbury's office saying something to the effect of, "Forget this. I'm out of here. Heck with DuPont." *Plaintiff Affidavit*, ¶ 16; *Plaintiff Depo.*, pp. 163-65; *Canterbury Affidavit*, ¶ 23; *Exhibit 3*, attached thereto; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. Ms. Canterbury asked plaintiff to return to her office and to clarify what he meant, but plaintiff kept on walking. *Plaintiff Depo.*, p. 165; *Canterbury Affidavit*, ¶ 23; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. Mr. Jacobs, following plaintiff, asked plaintiff to stop because he needed to convey more information to plaintiff. *Plaintiff Depo.*, p. 163; *Canterbury Affidavit*, ¶ 24; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. Plaintiff responded, "Back off. Don't want to talk to you. See you in court," exited the building and drove away. *Plaintiff Affidavit*, ¶ 16; *Plaintiff Depo.*, p. 163; *Jacobs Affidavit*, ¶ 15; *Exhibit 9*, attached thereto. Plaintiff exited the building and left DePont's premises.

Ms. Canterbury characterized plaintiff's actions and comments as "insubordination, failure to cooperate with an investigation and a resignation from employment." *Canterbury Affidavit*, ¶ 26.

The next day, plaintiff called Ms. Canterbury to ask about his status and when he could return to work. *Plaintiff Affidavit*, ¶ 17; *Plaintiff Depo.*, pp. 163-64, 169; *Canterbury Affidavit*, ¶ 27; *Exhibit*

*4*, attached thereto.  Ms. Canterbury responded that "DuPont likely considered his conduct a resignation." *Plaintiff Affidavit*, ¶ 17; *Plaintiff Depo.*, pp. 163-66, 169; *Canterbury Affidavit*, ¶ 27; *Exhibit 4*, attached thereto.  Plaintiff denied that he had resigned. *Plaintiff Affidavit*, ¶ 17; *Plaintiff Depo.*, p. 164.  When plaintiff again called the next day, Ms. Canterbury advised that "DuPont accepted his resignation and [she] informed him that [she] sent him a letter to that effect.  He did not ask for his job back or if he could reapply." *Canterbury Affidavit*, ¶ 28; *Exhibit 5*, attached thereto.

## II.   STANDARD

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  In making this determination, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).  However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla of evidence in support of the opposing party's position will be

insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Catrett,* 477 U.S. at 323. Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial"). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Glover v. Speedway Super Am. LLC,* 284 F.Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Instead, the non-moving party must support the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F. Supp.2d at 862 (citing *Antheral Corp. v. Slopseller,* 889 F.2d 108, 111 (6th Cir. 1989)). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified

pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id. See also* Fed. R. Civ. P. 56(c)(3).

Defendant has moved for summary judgment on all five of plaintiff's claims: (1) FMLA interference (Count I), (2) FMLA retaliation (Count II), (3) retaliation pursuant to Ohio Rev. Code 4112 (Count III), (4) race discrimination pursuant to Ohio Rev. Code 4112.02 and 4112.99 (Count IV), and (5) intentional infliction of emotional distress (Count V). Plaintiff opposes the *Motion for Summary Judgment* only as to the claims regarding FMLA interference and FMLA retaliation (Counts I and II), and does not specifically address defendant's arguments regarding his other three claims. *See Memo. in Opp.* The Court shall address each claim in turn.

## III. FMLA INTERFERENCE (Count I)

Plaintiff alleges that defendant "interfer[ed] with Plaintiff's FMLA rights by using FMLA-protected leave time as a factor in disciplining and ultimately terminating Plaintiff's employment." *Complaint*, ¶ 31. The United States Court of Appeals for the Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). The interference theory makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." 29 U.S.C. § 2615(a)(1).

In the absence of direct evidence, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to interference claims under the FMLA. *See*, *e.g.*, *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Under that framework, the plaintiff must first establish a *prima facie* case before the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *See*, *e.g.*, *Skrjanc v. Great Lakes Power Service Company*, 272 F.3d 309, 315 (6th Cir. 2001). If the employer carries this burden, the plaintiff must then show that this nondiscriminatory reason was in fact pretextual. *Id.*

To establish a *prima facie* case of FMLA interference, a plaintiff must show that:

> (1) []he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of h[is] intention to take leave; and (5) the employer denied the employee FMLA benefits to which []he was entitled.

*Id.* (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). The plaintiff bears the burden of establishing each of these elements by a preponderance of the evidence. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

An employee does not enjoy an absolute right to non-interference with medical leave. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the conduct." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citing

*Arban*, 345 F.3d at 401).  If the employer provides a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee's employment, the employee must "rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald*, 667 F.3d at 762.  Finally, because "the FMLA is not a strict-liability statute," *Edgar*, 443 F.3d at 507, "the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Verkade v. United States Postal Serv.*, No. 09-1268, 378 F. App'x 567, 575 (6th Cir. May 27, 2010) (internal quotation marks omitted).

In moving for summary judgment on plaintiff's FMLA interference claim, defendant does not dispute that plaintiff is an "eligible employee," that DuPont is an "employer," or that plaintiff gave DuPont notice of his intention to take leave. *Motion for Summary Judgment*, p. 8.  Instead, defendant argues that plaintiff cannot establish a *prima facie* showing because he cannot establish that (1) plaintiff was entitled to FMLA leave, or that (2) DuPont denied plaintiff FMLA leave. *Id*. at 8-10.[7]

A.    **Whether Plaintiff Was Entitled to Take FMLA Leave**

1.    **Standard**

_____

[7]Although defendant specifically argued in the *Motion for Summary Judgment* only that plaintiff cannot establish a *prima facie* case because he cannot prove these two elements, defendant suggests in its *Reply* that plaintiff was not an "eligible employee." *Reply*, p. 2.  However, that argument appears to relate only to defendant's argument that plaintiff was not entitled to FMLA leave. *Id*.  The Court will assume that plaintiff was an "eligible employee" and will address only the two arguments raised in the *Motion for Summary Judgment*, *i.e.*, whether plaintiff was entitled to leave and whether DuPont denied him leave.

An employee is entitled to take FMLA leave if he has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves. . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B). The applicable FMLA regulations provide that a "serious health condition" involving continuing treatment by a health care provider "includes . . . [a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition."[8] 29 C.F.R. § 825.115©.[9] *See also* 29 C.F.R. § 825.123(a) ("An employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment"). Summary judgment is appropriate if a plaintiff cannot establish incapacity. *See*, *e.g.*, *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 850 (W.D. Tenn. 2010).

The regulations define "incapacity" as the "inability to work,

_____

[8]The regulations define a "chronic serious health condition" as one that

(1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

(2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c).

[9]Unless noted otherwise, the current regulation was also in effect during the relevant time period.

attend school or perform other regular daily activities due to the
serious health condition, treatment therefor, or recovery therefrom."
29 C.F.R. § 825.113(b).  *See also Alston v. Sofa Express, Inc.*, No.
2:06-cv-0491, 2007 U.S. Dist. LEXIS 79719, at *8 (S.D. Ohio Oct. 19,
2007) (quoting *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1166 (N.D.
Ohio 1997)) (stating, *inter alia*, that incapacity "does not mean that,
in the employee's own judgment, he or she should not work, or even
that it was uncomfortable or inconvenient for the employee to have to
work").  Although the Sixth Circuit has not specifically addressed
what evidence supports a finding of incapacity, some district courts
considering the issue have concluded that the FMLA requires a
healthcare provider's determination of incapacity.  *See*, *e.g.*, *Kinds
v. Ohio Bell Tel. Co.*, No. 1:10CV01596, 2012 U.S. Dist. LEXIS 105507,
at *14 (N.D. Ohio July 30, 2012) ("This determination [of incapacity]
must be 'based on the medical provider's assessment of the claimed
condition.'  It is not enough that the employee is 'uncomfortable'
doing work; it must be that the employee cannot work because of the
illness.'") (citing *Olsen*, 979 F. Supp. at 1166) (internal citations
omitted); *Linebarger v. Honda of America Mfg.*, No. 2:10-cv-176, 2012
U.S. Dist. LEXIS 64229, at *24 (S.D. Ohio May 8, 2012) (stating that
incapacity under the FMLA "means that a 'health care provider' 'has
determined that, in his or her professional medical judgment, the
employee cannot work (or could not have worked) because of the
illness.'") (quoting *Alston*, 2007 U.S. Dist. LEXIS 79719, at *8);
*Neal v. Ingram Book Group, Inc.*, No. 3:10-cv-00943, 2011 U.S. Dist.
LEXIS 135048, at *7 (M.D. Tenn. Nov. 21, 2011) (citing, *inter alia*,
*Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tenn.

18

1995)).  *Cf. Kleinser v. Bay Park Cmty. Hosp.*, 793 F. Supp. 2d 1039, 1044 (N.D. Ohio 2011) ("The contours of an asserted entitlement to intermittent leave are necessarily determined by medical documentation from the employee's doctor identifying the impact an injury or illness has on the employee's ability to perform her job's functions.") (citing 29 C.F.R. § 825.202(b)).  Regardless of the type of evidence required, however, district courts in this circuit apparently agree that "incapacity" means "inability to work."  *Taylor*, 706 F. Supp. 2nd at 851 (collecting cases).

This case involves intermittent FMLA leave.  Under the FMLA, an employee who has "a serious health condition that makes the employee unable to perform the functions of" that employee's position, 29 U.S.C. § 2612(a)(1)(D), may be entitled to FMLA leave "intermittently or on a reduced leave schedule when medically necessary."  29 U.S.C. § 2612(b).  *See also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) ("FMLA leave must be granted, when medically necessary, on an intermittent . . . basis.") (citation omitted).  In all events, however, there must be a medical necessity for intermittent leave:

> For intermittent leave or leave on a reduced leave schedule taken because of one's own serious health condition . . . there must be a medical need for leave and it must be that such medical need can be best accommodated through an intermittent or reduced leave schedule.  The treatment regimen and other information described in the certification of a serious health condition and in the certification of a serious injury or illness, if required by the employer, addresses the medical necessity of intermittent leave or leave on a reduced leave schedule.

29 C.F.R. § 825.202(b).  *See also* 29 C.F.R. § 825.800 ("Examples of intermittent leave would include leave taken on an occasional basis for medical appointments, or leave taken several days at a time spread

over a period of six months, such as for chemotherapy."). In addition, under some circumstances, an employee may take intermittent leave even if the employee does not receive treatment:

> Intermittent or reduced schedule leave may be taken for absences where the employee . . . is incapacitated or unable to perform the essential functions of the position because of a chronic serious health condition or a serious injury or illness of a covered servicemember, even if he or she does not receive treatment by a health care provider. See §§ 825.113 and 825.127.

29 C.F.R. § 825.202(b)(2). "[T]he simple act of returning to work itself does not terminate a period of intermittent leave[.]" *Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 351 (6th Cir. 2008).

### 2. Application

As discussed *supra*, plaintiff submitted to defendant in May 2010 Dr. Clark's certification diagnosing plaintiff with depression. *Exhibit 3*, at DRR0000568, attached to *Plaintiff Affidavit* ("initial certification"). Dr. Clark specifically noted that "[i]ntermittent time off work may be necessary if depressive symptoms interfere with [plaintiff's] ability to go to work – no more than 4 days/month" and that the probable duration of this condition was unknown. *Id.*

Defendant argues that this initial certification for intermittent FMLA leave is insufficient to prove that plaintiff was unable to perform the functions of his job because of a serious health condition on September 23 and 24, 2010. *Motion for Summary Judgment*, pp. 8-9 (citing, *inter alia*, *Palmer v. Cacioppo*, No. 09-3924, 429 Fed. App'x 491 (6th Cir. June 28, 2011); 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. §§ 825.112(a), 825.113(a), 825.115©). In making this argument, defendant takes the position that plaintiff's own testimony establishes that he was not incapacitated on those dates. *Id.* Plaintiff, however,

contends that he was entitled to intermittent FMLA leave on these two days because (1) he was granted, based on the initial certification, intermittent FMLA leave through 2010, and (2) on September 27, 2010, plaintiff presented a note from Dr. Clark certifying that plaintiff's absence on September 23 and 24 was a consequence of his serious health condition. *Memo. in Opp.*, pp. 6-10 (citing *Davis v. Chicago Bell Tel. Co.*, 543 F.3d 345 (6th Cir. 2008)). Defendant disagrees in its reply, contending that plaintiff's initial certification did not grant a "free pass for twelve months to take leave regardless of his true condition[,]" and insisting that the evidence establishes that plaintiff was not incapacitated on September 23 and 24. *Reply*, pp. 1-2.

Here, there is evidence that, on September 23 and 24, 2010, plaintiff was suffering from and was treated for depression – the condition for which plaintiff was granted intermittent FMLA leave. Plaintiff testified that he was depressed on the morning of September 23 and that he had difficulty getting out of bed. As he had done in the past when taking intermittent FMLA leave for depression, plaintiff telephoned Mr. Jacobs and Nurse Grooms to alert them that he would not report to work. Plaintiff also attended a psychotherapy session with Dr. Clark on September 24 and Dr. Clark confirmed in a note that plaintiff's absence from work on September 23 and 24 related to his diagnosed medical condition. When plaintiff returned to work on September 27, he presented Dr. Clark's note, just as he had done on prior occasions when he took intermittent FMLA leave.

Viewing the evidence in the light most favorable to plaintiff, the Court concludes that there remains a genuine issue of

material fact as to whether plaintiff was entitled to take
intermittent FMLA leave on September 23 and 24, 2010.

**B.    Whether Defendant Denied FMLA Leave**

Defendant also argues that, even if plaintiff was entitled to
FMLA leave, he nevertheless cannot establish a *prima facie* case of
FMLA interference because DuPont did not deny plaintiff that FMLA
leave. *See Donald*, 667 F.3d at 762 (identifying the fifth element of
a *prima facie* case as "'the employer denied the employee FMLA benefits
to which []he was entitled'"); *Wysong*. 503 F.3d at 446-47.  More
specifically, defendant argues that DuPont "never reached a conclusion
denying" leave on September 23 and 24, 2010; rather, defendant
contends, the record establishes that defendant merely intended to
investigate plaintiff's requested leave on those dates. *Motion for
Summary Judgment*, p. 10.  Plaintiff takes the position that DuPont
"should have freely granted" his request for intermittent FMLA leave
on these days, just as it had previously done, because plaintiff
followed the same procedure requesting such leave. *Memo. in Opp.*, pp.
10-11.  Plaintiff argues that there was no reason for DuPont "to reach
a conclusion" as to whether to approve or deny intermittent leave in
September 2010 because DuPont had already approved intermittent leave
in May 2010. *Id*.  Indeed, plaintiff argues that his intermittent FMLA
leave in September 2010 "was already approved" when he returned to
work on September 27, 2010. *Id.* at 11.  In reply, defendant contends
that it did not deny leave because it "is undisputed that DuPont
wanted to investigate the true reasons for Plaintiff's request [for
leave on September 23 and 24] and therefore, had not made a final
decision regarding his leave." *Reply*, pp. 2-3 (citing, *inter alia*, 29

C.F.R. 825.308(c)(3)).[10]

Plaintiff appears to argue that DuPont's decision to investigate
the propriety of his September leave, in light of its prior approval
of intermittent leave, is equivalent to a denial of FMLA leave. *See
Memo. in Opp.*, pp. 10-11. However, plaintiff offers no legal support
for this position. *Id.* Moreover, although the United States Court of
Appeals for the Sixth Circuit has cast the fifth element of the *prima
facie* case of interference "as being that the employer has 'somehow
used the leave against [the employee] and in an unlawful manner, as
provided in either the statute or regulations[,]'" *Wysong*, 503 F.3d
at 446-47 (quoting *Bradley v. Mary Rutan Hosp.*, 322 F. Supp. 2d 926,
940 (S.D. Ohio 2004)), there is no evidence of such conduct in this
case. Indeed, "'[n]othing in the FMLA prevents employers from
ensuring that employees who are on leave from work do not abuse their
leave.'" *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 281 (6th
Cir. 2012) (quoting *Allen v. Butler County Comm'rs*, 331 F. App'x 389,
at *395 (6th Cir. 2009). "Fraud and dishonesty constitute lawful,
non-retaliatory bases for termination." *Id.* Accordingly,

> nothing in the FMLA prohibits an employer from investigating
> allegations of dishonesty or from terminating an employee
> who violates company policies governing dishonesty. The
> FMLA does not shield an employee from termination simply
> because the alleged misconduct concerns use of FMLA leave.

*Kitts v. Gen. Tel. N., Inc.*, No. 2:04-CV-173, 2005 U.S. Dist. LEXIS
20421, 2005 WL 2277438, at *11 (S.D. Ohio. Sept. 19, 2005). *Cf. Novak*

---

[10]The Court presumes that defendant's reference to 29 C.F.R. §
835.308(c)(3)is a typographical error and that defendant intended to refer to
29 C.F.R. § 825.308(c)(3), which addresses recertifications for leave taken
because of an employee's serious health condition or of the serious health
condition of a family member.

*v. MetroHealth Med. Ctr.*, 503 F.3d 572, 579 (6th Cir. 2007) ("[A]n employer that foregoes its right to a second medical opinion is not thereafter precluded from contesting the validity of any employee's serious health condition."); *Brock v. Honda of Am. Mfg.*, No. 2:06-cv-257, 2007 U.S. Dist. LEXIS 92028, at *16 (S.D. Ohio Dec. 14, 2007) ("Moreover, a Plaintiff is 'not shielded from disciplinary action for [] dishonesty simply because it concerned an FMLA-qualifying leave.'") (quoting *Kitts*, 2005 U.S. Dist. LEXIS 20421, at *37). Plaintiff has not shown that a decision to investigate is tantamount to a denial of FMLA benefits or is otherwise unlawful.

Defendant also apparently interprets plaintiff's argument relating to the investigation as challenging DuPont's right to request recertification in September after receiving the initial certification from Dr. Clark in May 2010. *See Reply*, p. 3. Under the FMLA, "[a]n employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee[.]" 29 U.S.C. § 2613(a). After the initial certification, an "employer may require that the eligible employee obtain subsequent recertifications on a reasonable basis." 29 U.S.C. § 2613(e). *See also* 29 C.F.R. § 825.308. "If the medical certification indicates that the minimum duration of the condition is more than 30 days, an employer must wait until that minimum duration expires before requesting a recertification[.]" 29 C.F.R. § 825.308(b). However, "[i]n all cases, an employer may request a recertification of a medical condition every six months in connection with an absence by the employee." *Id*. The FMLA therefore permits an employer to request recertification every six months in connection with an absence even if

the initial certification indicates a need for intermittent leave in excess of six months.

Under some circumstances, an employer may request recertification in fewer than 30 days. 29 C.F.R. § 825.308(b). In particular, an employer may request recertification if "[t]he employer receives information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification." 29 C.F.R. § 825.308©.

In the case *sub judice*, Dr. Clark's May 2010 initial certification indicated that the probable duration of plaintiff's depression was "unknown @ this time." *Exhibit 3*, at DRR0000568, attached to *Plaintiff Affidavit*. Defendant apparently interprets this as a duration lasting more than 30 days. *Cf. Reply*, p. 3 (invoking 29 C.F.R. § 825.308(c)(3)). Under that circumstance, DuPont could properly seek recertification only after the lapse of six months unless, *e.g.*, DuPont received information that cast doubt on plaintiff's stated reason for his absence on September 23 and 24, 2010. *See* 29 C.F.R. § 825.308(b), (c)(3).

Here, plaintiff had claimed FMLA leave on September 23, shortly after he had requested and been denied permission to take vacation on the day before in order to attend horse races that, DuPont's agents learned, lasted the entire week. Under these circumstances, DuPont was justified in seeking recertification in September 2010. *See* 29 C.F.R. § 825.308(c)(3).

In short, regardless of how plaintiff's arguments on this issue are construed, he has not shown that DuPont denied him FMLA leave or

otherwise used FMLA leave in an unlawful manner.  Plaintiff has
therefore not established a *prima facie* case of interference with his
FMLA rights.  Accordingly, defendant is entitled to summary judgment
on this claim.[11]

## IV.   FMLA RETALIATION (Count II)

Plaintiff also claims that defendant retaliated against him "by
terminating his employment due to Plaintiff's requests for, and use
of, FMLA leave time."  *Complaint*, ¶ 38.[12]  The FMLA prohibits an
employer from "discharg[ing] or in any other manner discriminat[ing]
against any individual for opposing any practice made unlawful by this
subchapter."  29 U.S.C. § 2615(a)(2).

In the absence of direct evidence, the burden-shifting framework
established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, also
applies to FMLA retaliation claims.  *See*, *e.g.*, *Donald,* 667 F.3d at
762.  Defendant argues that plaintiff cannot establish a *prima facie*
case of FMLA retaliation and that, in any event, his claim must fail
because DuPont had an honest belief that plaintiff was abusing his
FMLA leave.  The Court shall address each argument in turn.

### A.   *Prima Facie* Case

To establish a *prima facie* case of retaliation under the FMLA, a
plaintiff must establish that:

(1) [ ]he was engaged in an activity protected by the FMLA;

---

[11]In so concluding, the Court need not address defendant's assertion of
an honest belief as it relates to plaintiff's interference claim.  *See Motion
for Summary Judgment*, p. 10 (citing *Reinwald v. Huntington Nat'l Bank*, 684 F.
Supp. 2d 975, 984 (S.D. Ohio 2010)).  The Court will, however, address this
contention in connection with plaintiff's retaliation claim.

[12]There appears to be no dispute that the FMLA leave at issue in this
case is the leave taken only on September 23 and 24, 2010.

(2) the employer knew that []he was exercising h[is] rights
under the FMLA; (3) after learning of the employee's
exercise of FMLA rights, the employer took an employment
action adverse to h[im]; and (4) there was a causal
connection between the protected FMLA activity and the
adverse employment action.

*Donald*, 667 F.3d at 761 (quoting *Killian v. Yorozu Auto. Tenn., Inc.*,

454 F.3d 549, 556 (6th Cir. 2006)). "'The burden of proof at the

*prima facie* stage is minimal[.]'" *Seeger v. Cincinnati Bell Tel. Co.*,

681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d

324, 333 (6th Cir. 2007)). *See also Bryson v. Regis Corp.*, 498 F.3d

561, 571 (6th Cir. 2007) ("As an initial matter, '[a] plaintiff's

burden in establishing a *prima facie* case is not intended to be an

onerous one.'") (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272

F.3d 309, 315 (6th Cir. 2001)).

In moving for summary judgment on this claim, defendant contends

that plaintiff cannot establish a *prima facie* case because (1) he

suffered no adverse action, and (2) there is no causal connection

between DuPont's actions and any protected activity. *Motion for

Summary Judgment*, p. 10.[13] Even if plaintiff could establish a *prima

facie* case, DuPont argues that plaintiff's claim nevertheless fails

because DuPont had an honest belief that plaintiff abused his FMLA

leave. *Id*. at 10-11. The Court will address each of these arguments

_____

[13]Defendant also argues that plaintiff cannot establish a *prima facie*
case of retaliation because he cannot show that he was entitled to FMLA leave.
*Id*. at 10. However, defendant misstates the elements of a *prima facie* case of
retaliation. *See Motion for Summary Judgment*, p. 10 (citing *Edgar v. JAC
Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (listing the requirements of a
*prima facie* case of FMLA interference, which requires a showing that, *inter
alia*, the employee was entitled to FMLA leave)); *Donald*, 667 F.3d at 761
(setting forth the different elements comprising an interference claim and a
retaliation claim under the FMLA). Accordingly, the Court will not address
the issue of entitlement in its consideration of plaintiff's retaliation
claim.

in turn.

### 1. Adverse Action

"An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). Generally, a plaintiff does not suffer an adverse action where he voluntarily resigns. *Woodmore v. Farmington Hills Police Dep't*, No. 09-12967, 2011 U.S. Dist. LEXIS 57627, at *9 (E.D. Mich. May 31, 2011) (citing *Sims-Eiland v. Detroit Bd. of Ed.*, 173 F. Supp. 2d 682, 689 (E.D. Mich. 2001)).

Here, plaintiff alleges that defendant retaliated against him "by terminating his employment due to Plaintiff's requests for, and use of, FMLA leave time." *Complaint*, ¶ 38. Defendant contends that there was no "adverse action" and denies that it terminated plaintiff's employment because DuPont reasonably interpreted plaintiff's actions on September 27, 2010 as a resignation. *Motion for Summary Judgment*, p. 11; *Reply*, pp. 3-4. More specifically, defendant contends that, when he was asked to leave DuPont's premises pending an investigation into his FMLA, plaintiff's statements such as, "Forget this. I'm out of here. Heck with DuPont" and "Back off. Don't want to talk to you. See you in court" support DuPont's conclusion that plaintiff had resigned his employment. *Motion for Summary Judgment*, p. 11 (quoting *Plaintiff Depo.*, pp. 163-65; *Jacobs Affidavit*, ¶ 15). Plaintiff disagrees with defendant's characterization, arguing that DuPont fired him and pointing to other evidence that undermines DuPont's position that plaintiff resigned. *Memo. in Opp.*, pp. 12-13.

Plaintiff's arguments are well-taken. As discussed *supra*, the plaintiff's burden at this stage is minimal. *Seeger*, 681 F.3d at 283; *Bryson*, 498 F.3d at 571. Here, the evidence reflects a genuine issue of material fact as to whether plaintiff resigned or was terminated. For example, although plaintiff told Ms. Canterbury, "Forget this. I'm out of here. Heck with DuPont" and left the premises, there is also evidence that she directed plaintiff to leave DuPont's premises pending the FMLA investigation. *See*, *e.g.*, *Plaintiff Depo.*, pp. 164-65. Moreover, although plaintiff also told Mr. Jacobs "See you in court," there is evidence that plaintiff had, on a prior occasion and without resigning his employment, utilized the services of an attorney in his dealings with DuPont. *See Plaintiff Depo.*, p. 203; *Canterbury Affidavit*, ¶ 13 and *Exhibit 1*, attached thereto. Furthermore, plaintiff's conversations with Ms. Canterbury in the ensuing days could be construed as inconsistent with a resignation. *See, e.g.*, *Plaintiff Affidavit*, ¶ 17; *Plaintiff Depo.*, pp. 163-64; *Exhibit 4*, attached to *Canterbury Affidavit*. The Court concludes that plaintiff has met his minimal burden of showing a genuine issue of material fact as to whether he suffered an adverse action, namely, the termination of employment.

## 2. Causal Connection

Defendant also argues that plaintiff cannot establish a causal connection between his September FMLA leave and the alleged adverse action. *Motion for Summary Judgment*, pp. 11-12; *Reply*, p. 4. Again, "'[t]he burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the

retaliatory action and the protected activity.'" *Seeger*, 681 F.3d at

283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

"'[I]n certain distinct cases where the temporal proximity between the

protected activity and the adverse employment action is acutely near

in time, that close proximity is deemed indirect evidence such as to

permit an inference of retaliation to arise.'" *Id.* at 283-84 (quoting

*DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)). *See also*

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)

("Where an adverse employment action occurs very close in time after

an employer learns of a protected activity, such temporal proximity

between the events is significant enough to constitute evidence of a

causal connection for the purposes of establishing a *prima facie* case

of retaliation.").

Here, plaintiff took FMLA leave on September 23 and 24 and the

claimed adverse action, termination of employment, occurred on

September 27. Under binding Sixth Circuit authority, this temporal

proximity is sufficient to establish a causal connection. *See*, *e.g.*,

*Seeger*, 681 F.3d at 283.

**B.    Legitimate, Nondiscriminatory Reason, Pretext and Honest Belief**

Defendant argues that plaintiff's retaliation claim nevertheless

fails because DuPont has articulated legitimate, nondiscriminatory

reasons supporting a termination of plaintiff's employment: (1) its

honest belief that plaintiff had abused his FMLA leave and (2)

plaintiff's "blatant insubordination." *Motion for Summary Judgment*,

pp. 12, 14, 16. This articulation satisfies DuPont's burden at this

stage. Accordingly, the burden now shifts to plaintiff to show that

these articulated reasons are in fact pretextual. *Skrjanc v. Great Lakes Power Service Company*, 272 F.3d at 315.

### 1. Honest belief

An inference of pretext is unwarranted where an employer has an honest belief in its proffered reason. *Seeger*, 681 F.3d at 285 (quoting *Joostberns v. United Parcel Servs., Inc.*, No. 04-2370, 166 F. App'x 783, 794 (6th Cir. Jan. 9, 2006)). Under the honest belief rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). However, "[a]n employer's invocation of the honest belief rule does not automatically shield it, because the employee must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is 'too obvious to be unintentional.'" *Seeger*, 681 F.3d at 286 (quoting *Smith*, 155 F.3d at 807).

"[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith*, 155 F.3d at 807. In determining whether an employer has met this standard, courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id*. Instead, "the key inquiry is whether the employer

made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

In order to prevail on this argument, DuPont must have made "a reasonably informed and considered decision" before terminating plaintiff's employment based on an honest belief that plaintiff had abused FMLA leave. *Smith*, 155 F.3d at 807. Defendant identifies several facts underlying its claimed honest belief. *Motion for Summary Judgment*, pp. 12-13. First, DuPont points to plaintiff's history of attendance problems for which progressive discipline had been imposed. *See Plaintiff Depo.*, pp. 113-16, 119-22; *Exhibits 15-17*, *19*, *21*, attached thereto. Second, plaintiff repeatedly asked Mr. Jacobs and Ms. Canterbury for time off so that he could attend horse races on September 22, 2010. *See Plaintiff Depo.*, pp. 152-54; *Jacobs Affidavit*, ¶¶ 11-13, and *Exhibits 6 - 8*, attached thereto; *Canterbury Affidavit*, ¶¶ 18-19. Third, plaintiff denied Mr. Jacobs's offer to work a split shift on September 22 because the horse races were a "family event" that involved drinking. *Plaintiff Depo.*, pp. 153-54; *Exhibit 6*, attached to *Jacobs Affidavit*. Fourth, plaintiff had not accrued enough vacation time for a full day off of work. *Plaintiff Depo.*, pp. 153-54; *Jacobs Affidavit*, ¶¶ 12-13 and *Exhibits 7-8*, attached thereto; *Canterbury Affidavit*, ¶¶ 18-19, 21. Fifth, after having been denied vacation or personal leave September 22, plaintiff invoked FMLA leave on September 23. *Plaintiff Depo.*, pp. 158-59; *Jacobs Affidavit*, ¶ 13 and *Exhibit 8*, attached thereto; *Canterbury Affidavit*, ¶¶ 20-21. Finally, DuPont learned that the horse racing event that plaintiff wanted to attend lasted the entire week. *Jacobs Affidavit*, ¶ 14.

However, plaintiff points to other evidence that calls into question defendant's professed reasons underlying its honest belief. *See Memo. in Opp.*, pp. 13-16. First, plaintiff presented to Ms. Canterbury on September 27 Dr. Clark's note, which documented plaintiff's FMLA leave. In doing so, plaintiff followed the same procedure that he had always followed when returning from previous, authorized FMLA leave. Finally, a jury could find that the decision to terminate plaintiff's employment (if such a decision was in fact made) was not "a reasonably informed and considered decision," *see Smith*, 155 F.3d at 807, in light of the fact that the investigation that DuPont proposed had not yet taken place. *Cf. Hoskins v. Pridgeon & Clay, Inc.*, No. 1:05-CV-816, 2007 U.S. Dist. LEXIS 24674, at *5-6, 20-22 (W.D. Mich. Apr. 3, 2007) (concluding that sufficient "particularized facts," some of which were gleaned from interviews with other employees, provided a reasonable basis for the employer to conclude that the employee falsely claimed FMLA leave where, *inter alia*, where employer previously denied a vacation request for the same day); *Stonum v. U.S. Airways, Inc.*, 83 F. Supp. 2d 894, 902 (S.D. Ohio 1999) (finding that employer reasonably relied upon a number of particularized facts in deciding to terminate plaintiff's employment, including particularized facts provided by employer's private investigator's report)). *See*, *e.g.*, *White v. Telcom Credit Union*, No. 11-12118, 2012 U.S. Dist. LEXIS 84558, at *52-55 (E.D. Mich. June 19, 2012) (finding genuine issue of material fact as to honest belief where, *inter alia*, defendant's CEO did not conduct any investigation); *Kurtzman v. Univ. of Cincinnati*, No. 1:09-cv-580-HJW, 2012 U.S. Dist. LEXIS 69319, at *36-39 (S.D. Ohio May 17, 2012) (finding a genuine

issue of material fact as to honest belief where, *inter alia*, there is no evidence that the supervisor "conducted any investigation, much less a 'reasonable' one, of the four stated reasons for discharge" and concluding that the plaintiff "has put forth sufficient evidence to establish that his employer did not make a reasonably informed and considered decision before taking the adverse employment actions against him").

Under all these circumstances, this Court concludes that there is a genuine issue of material fact as to whether defendant held an honest belief that justified the termination of plaintiff's employment.

### 2. Plaintiff's insubordination

Defendant also contends that plaintiff's "blatant insubordination further constitutes a legitimate business reason for any termination." *Motion for Summary Judgment*, p. 14 (citing *Russell v. Univ. of Toledo*, 537 F.3d 596, 599 (6th Cir. 2008); *Griswold v. Fresenius USA*, 978 F. Supp. 718, 733 (N.D. Ohio 1997)). Because defendant does not identify the specific alleged insubordinate behavior upon which it relies, *Motion for Summary Judgment*, p. 14, the Court presumes that defendant intends to rely on statements made by plaintiff as he was leaving DuPont's premises on September 27 and/or the fact that plaintiff left the premises on that day. However, the record contains evidence that plaintiff did not curse at DuPont employees, *see Plaintiff Depo.*, pp. 164-66; *Plaintiff Affidavit*, ¶ 16, and that he left the premises only after being directed by Ms. Canterbury to do so. Taking the record as a whole and accepting plaintiff's version of the facts for purposes of the *Motion for Summary Judgment*, the Court concludes that there is a

34

genuine issue of material fact in connection with defendant's contention that plaintiff's insubordination justified the termination of his employment.

In short, defendant is not entitled to summary judgment on plaintiff's FMLA retaliation claim.

## V.   RETALIATION IN VIOLATION O.R.C. § 4112 (Count III)

Defendant also moves for summary judgment on plaintiff's claim of retaliation in violation of O.R.C. Chapter 4112. *Complaint*, Count III. More specifically, plaintiff alleges that DuPont retaliated against him for complaining of racial "harassment and discriminatory treatment from 2007 through his termination in 2010." *Id*. at ¶ 42. Plaintiff has failed to respond to defendant's motion for summary judgment on this claim.

Under Rule 56, "[t]he moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only show . . . that there is an absence of evidence to support the nonmoving party's case." *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996)(citing *Celotex Corp. V. Catrett,* 477 U.S. 317, 325 (1986)). Once the moving party meets this initial burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). Moreover, a court has no obligation to search through the record or case law in order to find support for plaintiff's claims. *See*, *e.g.*, *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405-06 (6th Cir. 1992).

Because plaintiff has not responded to defendant's motion in this regard, the Court concludes that DuPont is entitled to summary

judgment on this claim.

## VI. RETALIATION IN VIOLATION OF PUBLIC POLICY (Count III)[14]

Plaintiff also alleges that defendant terminated his employment in violation of public policy. *Complaint*, ¶¶ 41-47. In moving for summary judgment on this claim, defendant argues that this claim "is barred because statutory remedies already exist under FMLA and O.R.C. 4112." *Motion for Summary Judgment*, p. 15 n.5. Plaintiff has not responded to this argument.

This Court agrees that the availability of statutory remedies under the FMLA and O.R.C. § 4112 bars plaintiff's public policy claim. *See*, *e.g.*, *Carrasco v. NOAMTC Inc.*, No. 03-4229, 124 Fed. App'x 297, at *304 (6th Cir. Dec. 1, 2004) (quoting *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 244 (2002)) (granting summary judgment in favor of defendant where "plaintiff had a remedy available to him under both Title VII and the OCRA [and]. . . he cannot have that same claim under Ohio common law"). Defendant is therefore entitled to summary judgment on plaintiff's public policy claim.

## VII. RACE DISCRIMINATION IN VIOLATION OF O.R.C. §§ 4112.02 and 4112.99 (Count IV)

Plaintiff alleges that defendant discriminated against him on the basis of race in violation of O.R.C. §§ 4112.02, .99, by failing to promote him and "unjustly disciplining Plaintiff for alleged attendance infractions while non-minorities were not similarly disciplined[.]" *Complaint*, ¶¶ 49-50. Federal case law governing Title VII actions is generally applicable to discrimination claims

---

[14]Count III alleges retaliation in violation of both public policy and O.R.C. § 4112. *Complaint*, ¶¶ 41-47. For ease of analysis, the Court has addressed these allegations separately.

under Ohio law. *See*, *e.g.*, *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999). Where a plaintiff has not offered direct evidence of discrimination, the court analyzes such claims under the *McDonnell Douglas* burden-shifting framework. *See Clay v. UPS*, 501 F.3d 695, 703 (6th Cir. 2004).

### A. Failure to Promote

Plaintiff alleges that defendant failed to promote him because of his race. To establish a *prima facie* case of race discrimination, a plaintiff must establish that:

> (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 562-563 (6th Cir. 2000).

Because plaintiff has not responded to the *Motion for Summary Judgment* as it relates to this claim, the facts stated in the affidavits and other papers submitted in support of defendant's motion will be accepted as true by the Court. *See* Fed. R. Civ. P. 56(e)(2), (3).

As an initial matter, the record establishes that defendant repeatedly promoted plaintiff. *See Plaintiff Depo.*, pp. 28-33, 37-39; *Exhibits* 7, 9, attached thereto. As to the five promotions denied plaintiff, DuPont awarded two of those positions, one of which would be a lateral move for plaintiff, to minority males. *Canterbury Affidavit*, ¶ 6. To the extent that plaintiff complains that DuPont failed to promote him to the MiniMix positions and FasTrac Coordinator position, DuPont has established that it selected candidates who were more qualified than plaintiff or who performed better during interviews. *Id.* ¶¶ 7-10. Accordingly, the record establishes that

37

defendant selected other applicants for these positions for
legitimate, nondiscriminatory reasons.  Plaintiff has not shown that
these articulated reasons are pretextual.  Accordingly, defendant is
entitled to summary judgment on this claim.

**B.  Discipline Related to Attendance Infractions**

Defendant also contends that plaintiff cannot establish a *prima
facie* case of race discrimination based on discipline related to his
attendance infractions.  This Court agrees.  It is true that plaintiff
received verbal and written warnings in connection with his attendance
occurrences.  However, under the facts of this case, such warnings did
not constitute adverse actions sufficient to establish a *prima facie*
case of discrimination.  *See*, *e.g.*, *Zanders v. Potter*, No. 06-2066,
223 Fed. App'x 470, at *470 (May 8, 2007) (affirming grant of summary
judgment in favor of defendant where, *inter alia*, a "letter of warning
did not result in a loss of position, salary, benefits, or prestige").

Moreover, plaintiff has not identified similarly situated
comparators who were treated more favorably than he.  *See Nguyen*, 229
F.3d at 562-563.  Here, plaintiff admits that he knew of no non-
minority employees who were not held to the standards of DuPont's
Attendance Policy.  *Plaintiff Depo.*, p. 206.  It is apparent that
plaintiff cannot establish a *prima facie* case of race discrimination.
Defendant is therefore entitled to judgment on this claim.

**VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Count V)**

Finally, plaintiff alleges that defendant "intentionally or
recklessly caused serious emotional distress to Plaintiff when
Defendant harassed and discriminated against Plaintiff on the basis of
his race and mental condition."  *Complaint*, ¶ 56.  "Under Ohio law,
such a claim exists where '[o]ne who by extreme and outrageous conduct

38

intentionally or recklessly causes serious emotional distress to another.'" *Blackshear v. Interstate Brands Corp.*, No. 10-3696, 2012 U.S. App. LEXIS 17628, at *13-14 (6th Cir. Aug. 20, 2012) (quoting *Anderson v. Eyman*, 180 Ohio App. 3d 794, 808 (Ohio Ct. App. 2009)). To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show that

> (1) defendant[] intended to cause emotional distress, or knew or should have known that [its] actions would result in plaintiff's serious emotional distress, (2) defendant['s] conduct was extreme and outrageous, (3) defendant['s] actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish.

*Id.* (quoting *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citing *Hanly v. Riverside Methodist Hosp.*, 78 Ohio App. 3d 73, 82 (Ohio Ct. App. 1991)). An employer is not liable for "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." *Yeager v. Local Union 20,* 6 Ohio St. 3d 369, 374 (1983).

Plaintiff has not responded to the *Motion for Summary Judgment* as it relates to this claim. Therefore, the Court accepts as true the facts stated in the affidavits and other papers submitted in support of defendant's motion. *See* Fed. R. Civ. P. 56(e)(2), (3). First, plaintiff has not established the requisite intent. DuPont timely responded to plaintiff's complaints of discrimination. *Exhibit 1*, attached to *Canterbury Affidavit* (DuPont letter addressed to plaintiff's counsel responding to allegations of failures to promote). In addition, plaintiff acknowledged that DuPont employees, including Mr. Jacobs, did not intend to cause him harm. *Plaintiff Depo.*, p. 208. Second, "termination [of employment], even if based upon

discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999). *See also Seifert v. Graphic Packaging Int'l, Inc.*, No. 11-4087, 2012 U.S. App. LEXIS 21004, at *3 (6th Cir. Oct. 10, 2012) (finding, *inter alia*, that termination of employment for alleged poor performance "did not amount to extreme and outrageous conduct"); *Baab v. AMR Services Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993) ("To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."). Here, even if DuPont terminated plaintiff's employment, which it denies, plaintiff has offered no proof of the "something more" that could give rise to a claim of intentional infliction of emotional distress. Third, plaintiff has not shown that he has suffered serious emotional distress as a result of defendant's actions. To be actionable, the emotional injury must be so "severe and debilitating" that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanke, 6 Ohio St. 3d 72, 78 (1983)*. Here, plaintiff concedes that, since his employment with DuPont ended, he has "been able to cope without medication" for anxiety and depression. *Plaintiff Depo.*, pp. 184-85. Plaintiff has therefore failed to present evidence sufficient to support his claim of intentional infliction of emotional distress. Defendant is entitled to summary judgment on this claim.

**WHEREUPON**, *Defendant's Motion for Summary Judgment*, Doc. No. 17, is **GRANTED** in part and **DENIED** in part. Specifically, the motion is **GRANTED** as to plaintiff's claims of FMLA interference (Count I);

retaliation in violation of public policy and O.R.C. § 4112 (Count III); race discrimination in violation of O.R.C. §§ 4112.02, .99 (Count IV); and intentional infliction of emotional distress (Count V), but **DENIED** as to plaintiff's claim of FMLA retaliation (Count II).


November 20, 2012                    <u>*s/Norah McCann King*</u>
                                     Norah M<sup>c</sup>Cann King
                              United States Magistrate Judge